THE LUNDOFF-BICKNELL CO. v. SMITH ET AL.

*Injunction—Workmen violate agreement with employer not to
collectively quit work—Mandatory injunction, enforceable
by contempt, denied, when—Requiring union officers to
order men to return to work—Collectively quitting work
not unlawful or illegal, when—Third parties not enjoined
from interfering with contract relations, when.*

1. If workmen in the ordinary trades agree with their employer not to collectively quit work, and they violate such agreement, a court of equity may not compel them to resume work.
2. In such a case, a court of equity will not make a mandatory order, which is to be enforced by the extraordinary remedy of contempt proceedings, unless the ultimate purpose to be accomplished by such order is one which such court is empowered to accomplish.
3. Where workmen, not employed in war industries and bound by contract with their employer not to strike, do, by concerted action, leave the service of their employer, having a *bona fide* trade dispute with such employer, and acting honestly and peaceably, and not simply to do injury and wrong, their acts not being in violation of any statute or order having the force of a statute, and they not interfering with the free action of others or molesting the property of their employer, such violation of their contract does not make their act of collectively quitting unlawful or illegal.
4. Where workmen have so breached their contract and do not desire to perform same, and the situation is such that a court of equity cannot compel them to do so, a court of equity will not enjoin third parties from interfering with the contract relation of the parties.

(Decided January 11, 1927.)

APPEAL: Court of Appeals for Cuyahoga county.

*Messrs. Squire, Sanders & Dempsey, Messrs.*

*Stanley & Horwitz,* and *Mr. W. C. Merrick,* for plaintiff.

*Mr. William J. Corrigan* and *Mr. J. E. Mathews,* for defendants.

WASHBURN, J.   There are more than a dozen crafts in the building trades industry in Cleveland. In each craft there is an organization of employes and a corresponding organization of employers. There are existing contracts between the employers' organization and the employes' organization in all of the crafts, except that of the painters and glaziers.   These are entirely separate contracts, and each relates entirely to the craft in reference to which the contract was made, and in said contracts there is no attempt made to cover or agree upon working conditions in crafts other than the one to which the particular contract relates.   No two of the contracts are identical, and all combined they cover 150 pages.   We cannot attempt to make even a summarization of all of them, but so far as the questions involved in this case are concerned a general idea of them may be obtained from a statement of some of the provisions of one of them, the laborers' contract.

The parties to that contract jointly and severally agreed and covenanted that they would be governed and bound thereby.   It provides that the "workmen are at liberty to work for whomsoever they see fit," and that the "employers are at liberty to employ and discharge whomsoever they see fit," and provides:

"It is expressly understood that there shall be no strikes or lockouts of any kind ordered or permitted against the members of either party here-

to, pending a decision in accordance with the arbitration plan as outlined in Article XIX. Such decision shall be final and binding on the parties to the dispute. It is understood, however, that union men shall not be compelled to work with nonunion men *in the same trade in or on the same building.*"

It also provides that, in the event members of such workmen's organization cannot be secured with reasonable effort, the employer shall be permitted to hire workmen in that craft who are not members of that organization, provided they signify their willingness to join such organization, and then provides in Article XIX as follows:

"For the purpose of administering this agreement a joint arbitration committee shall be established by the appointment of five members of the party of the first part and an equal number of members of the party of the second part. In case *any* dispute or disagreement shall arise between such parties, the same shall be reported at once, and before any action is taken, to the chairman of such joint committee, who shall call a meeting of the entire committee within twenty-four hours of receipt of such information. There shall be no cessation of work pending such decision."

Many of the other contracts contain provisions similar to the foregoing, providing for an arbitration committee for the purpose of settling disputes between the employers and employes, and providing that there shall be no cessation of work while the parties are attempting to settle their differences, and in most of those that do not contain express provisions to that effect such provisions are fairly implied from the whole contract, con-

sidered in the light of all the facts and circumstances.

As has been said, all of the crafts in the building industry were covered by these contracts except the painters and glaziers, whose contract had expired and who had been engaged in a strike during the summer.

The plaintiff company, having the general contract to construct the Bell Telephone building, was a member of several of these contractors' organizations, and each of said company's subcontractors was a member of the contractors' organization in his particular craft.

All of the men working upon the building were union men, being members of said organizations, and on September 13, 1926, the subcontractor for the painting and glazing put four nonunion glaziers to work on the building, and the workmen in the other crafts, through their agents, objected to the employment of said nonunion glaziers on the job, and after some negotiations, not being able to have said nonunion glaziers discharged, all of the men on the job quit work at the same time, and thereupon this action was begun by the plaintiff, the company having the general contract for the construction of the building, and in the court below plaintiff obtained an order requiring the officers of the union organizations to rescind an order to strike, found to have been made by them, and enjoining them from doing anything to induce or influence the men not to go back to work.

On appeal the case has been heard *de novo* in this court.

No strike was called in accordance with and in the manner provided by the constitutions and by-

laws of the union organizations, and on the important disputed question of fact in the case we find that the plaintiff has not established by a preponderance of the evidence that the men quit work in obedience to any order made by the officers and agents of said unions; but we do find that the men quit by concerted action and that the officers and agents of said unions were in sympathy with the men's quitting, and took no action to prevent the strike after the contractors had refused to remove the nonunion glaziers from the job, or to have the men go back to work after the strike, or to have the dispute arbitrated in accordance with said contracts.

It should be kept in mind that this is an action in equity, and we are not attempting to determine the rights of the parties at law.

It is the claim of the men who quit, and of the organizations of which they are members, that the quitting of the men was not a violation of their contracts, and it is the claim of the contractor that, even if under each contract the presence of nonunion men in a particular craft justified the workmen in such craft in collectively quitting without violating their contract, none of said contracts gave to the workmen in one craft the right to quit because nonunion men were employed in another craft, and that that matter, not being covered by any express provision of the contracts, was a matter which the workmen were required by the contracts to arbitrate, and that a strike without any attempt to arbitrate was a violation of the contracts.

As has been said, the provisions of these contracts vary. Some of them contain the express

provision that matters expressly agreed to in the contracts shall not be subject to arbitration, and in others, where such an express provision is not made, it is implied, and, except as to such matters, the contracts usually provide that *any* dispute or disagreement arising between the parties shall be referred to an arbitration committee. We are of the opinion that, considering the expressed objects and purposes of these agreements and all the facts and circumstances, the disagreement as to whether or not nonunion glaziers should be permitted to work upon the building was a dispute which the workmen in crafts other than painting and glazing were required to attempt to settle and adjust under the provisions of the contracts, and that the collective quitting of the men without such attempt was a violation of their contracts.

The claim of secondary boycott is inconsistent with the claim that the men had a trade dispute with plaintiff as to whether said contracts covered the situation in which the contracting parties found themselves to be, and which they were bound to arbitrate under said contracts, and we find that the men did have a trade dispute with their employers, and that the facts do not warrant a finding that there was a secondary boycott.

There is no claim that the defendants acted maliciously, with the purpose of merely injuring the plaintiff, and there is no evidence of violence or destruction of property; and we find that the men had a trade dispute with their employers, with whom they had contracts, and that the situation was such that, except for the claimed breach of said contracts, the evidence does not establish an unlawful conspiracy. On the part of the men there

was an honest, though untenable, claim as to the proper construction of said contract, and they did not quit their employment for the purpose and with the intention of wronging and injuring the plaintiff; they had a right to quit as they did, unless the contracts made such action wrongful, so the basis of the plaintiff's cause of action is the claimed violation of the contracts.

As we construe said contracts, almost all of them, either by express provision or by implication, bound the men not to strike, but to submit their dispute with their employer concerning the presence of the four nonunion glaziers on the job to arbitration in the manner provided in said contracts, but we recognize the fact that there might have been an honest difference of opinion as to whether or not the contracts required the men to arbitrate the dispute growing out of the presence on the job of said nonunion glaziers—that is, as to whether our construction is the true and proper construction of said contracts.

We find above to be the true and proper construction of said contracts, and that the men violated their contracts by quitting as they did; but we are unable to find that the men were not honest in their contention as to the meaning of said contracts, or that they were guilty of any wrong except the mere violation of their contracts.

The wrong that they did was to quit work in a body, and that was wrong only because they had agreed not to do so.

Plaintiff, the general contractor, was a party to only five of said contracts. The subcontractors who were parties to the other contracts are not parties to this suit. But, assuming that the situation

is such that plaintiff's rights were invaded by the violation of all of said contracts, and assuming that said contracts do not contravene public policy, and as to that there is not sufficient evidence to enable us to express an opinion, what relief can a court of equity afford plaintiff, after its men have quit in violation of their contracts?

It has long been settled that, if an individual employe quits work in violation of his express contract, a court of equity will not, indirectly or negatively, by means of an injunction restraining a violation of the contract, compel the employe to perform his contract by performing the personal service he agreed to perform.

Relief of that character has always been regarded as impracticable, and as an invasion of one's natural liberty, involuntary servitude being prohibited by the Constitution. Where the contract was one for unique or extraordinary personal services, requiring special knowledge or peculiar skill, such as singing or acting, and the agreement was to perform such services for a particular person, and not to perform them for any one else for a stated period (and in some instances where there was no such express, but only an implied, negative covenant), courts of equity have enjoined those agreeing to perform such professional services from performing like services for others during the time covered by the contract; but courts of equity have never attempted to compel the *affirmative* performance of even an agreement to sing or act. So far as we know, a court of equity has never attempted to compel a person to perform personal services, nor to compel an employer to accept the personal services of an employe. As

was said by Judge Taft: "The reason is obvious; it would be impracticable to enforce the relation of master and servant against the wish of either."

The contracts in question are not for the services of any particular persons, and are not for unique or extraordinary services, requiring special knowledge or peculiar skill.

We conclude that, treating them as individuals, we are without power to make an order that the men who quit work shall go back to work, or that other members of the defendant unions shall go to work on said building.

As to our power as a court of equity to afford relief to plaintiff, what effect has the fact that the men combined and acted in concert in committing the wrong or violating their contracts?

Men may combine to do a lawful act by lawful means, and their agreement to so act in concert does not constitute a conspiracy and is not illegal. In this case there was no unlawful means employed. Was the violation of their contract unlawful? The mere breaching of a contract is not unlawful; it may be wrong, and may render the wrongdoer liable, but it is not prohibited by law. If one contracts to build a house, he may change his mind and refuse to build it, paying the damages; but he does not commit an unlawful act by such breach of his contract. There are well-considered cases which support the proposition that if two or more whose individual breach of a contract would not be unlawful act together in breaching such contract, and do no wrong except the mere breach of the contract, their acting in concert is not unlawful.

Accordingly, it has been held, and we think properly, that workmen, who are bound by contract

not to strike, may, by concerted action, leave the service of their employer and their act in so doing will not constitute an illegal strike, if they have a *bona fide* dispute with their employer, and act honestly and peaceably, and not simply to do injury and wrong, and do not interfere with the free action of others, or molest the property of their employer; in other words, the *mere* violation of a contract not to strike does not render a strike illegal.

But if the view expressed in other cases be adopted, and the collective quitting of the men did constitute an illegal strike in this case, we can find no satisfactory reason for holding that a court of equity can compel them to return to work collectively, any more than individually, and we are of the opinion that the facts of this case do not warrant any such action.

Only a comparatively few of the members of the defendant unions were working on the building in question, and, as has been said, we do not find that the defendant officers and agents of the unions ordered or caused the men to quit; therefore we can make no order requiring them to take any affirmative action to rescind anything done by them.

It is urged, however, by counsel for plaintiff, that this court should issue a mandatory injunction ordering the officers and agents of defendant unions to use their alleged disciplinary power under the constitutions and by-laws of their respective organizations to make the men who struck return to work.

This, too, we do not feel we have the power to do.

A court of equity should not make a *mandatory* order, which is to be enforced by the extraordinary remedy of contempt, unless the ultimate purpose to be accomplished by such order is one which such court is empowered to accomplish. If we cannot order the men themselves, who are parties to this suit, to perform personal services, we ought not to make an order the only purpose of which is to indirectly accomplish that result.

Plaintiff was a member of only five of the contractor organizations which entered into said contracts, and, not being a party to the other contracts, we are unable to see how plaintiff can claim the benefit of them. Generally only parties to a contract are affected by it, and it does not impose liabilities on persons not parties to it, nor confer rights on them. The subcontractors, who entered into said other contracts and are entitled to the benefit thereof, did not enter into and become bound by said contracts because of any provision in their contracts with plaintiff. Plaintiff was not bound by its contract with the owner to observe and comply with said contracts, and has in no manner assumed any obligation in reference to them; the general rule is that, unless the contract is expressly made for his benefit, one who is not a party to a contract cannot maintain suit on it, nor can he maintain a suit against a third party, who induces one of the parties to such contract to breach the same, because such third party, under such circumstances, owes no legal duty to the one not a party to the contract.

If the workmen, under the contracts to which plaintiff was not a party, had a trade dispute to settle with their employers, the subcontractors,

and their contracts with such subcontractors bound them not to strike because of said dispute, but they nevertheless did strike, their act in doing so would be wrongful as to such subcontractors; but, if the violation of their contracts was the only thing that made their striking wrongful, their act would not be wrongful as to any one not a party to said contracts.

In this case we find that, but for said contracts, the men had a right to strike, and that the only wrongful act done by them was to violate their contracts by collectively quitting, and therefore the contracts to which plaintiff was not a party cannot be enforced by plaintiff, nor can plaintiff maintain a suit against those who, it is claimed, induced the men to violate their said contracts.

During the hearing of the case, at the suggestion of this court, work was resumed on the building, with the exception of the painting and glazing, and no painting and glazing have been done since then; the men went back to work with the understanding that their doing so would not prejudice their rights in this suit, and hence the decision and order must be based upon the situation as it was at the time said truce was agreed to by the parties. Therefore, for the purposes of this case, the men are not now working, they having quit on September 18; we have found that so quitting was a breach of their contracts, but that, for reasons already given, a court of equity should make no order designed, directly or indirectly, to compel them to go back to work. Ought we to make any order preventing third parties interfering with the contract relations of plaintiff as to the five contracts to which plaintiff was a party?

These contracts do not provide for the services of any particular persons, nor is there an *express* stipulation that a particular class of persons should perform the work on said building; if, at the beginning of the construction of said building, plaintiff had determined not to make use of any union labor, or the unions had determined not to do any work on said building, neither of the parties would have violated any *express* provision of the contracts; if a third party, desiring plaintiff to build a building and knowing of said contracts, had required the plaintiff to agree not to employ union men in the construction of the building, would such owner have thereby become liable to the unions for causing plaintiff to breach said contracts? It is no answer to say that these contracts were so made indefinite and uncertain because of a fear that, if they expressed what the parties intended, they would probably violate public policy and be unenforceable.

The contracts established the terms of an employment, and the working conditions when an employer hired a given worker, and expressly provided that there should be no lockouts or strikes; after the contracts have been completely breached, and the situation is such that a court of equity does not have power to compel the parties to resume operations and carry out the contracts, and there is no evidence that the men desire to carry out their contracts by working with nonunion glaziers or submitting that question to arbitration, is there such a contract relation as will justify a court in enjoining third parties from interfering with it?

The glaziers had no contract, and we do not

find in the contracts as to the other trades any express or implied provision as to whether non-union glaziers could or could not be employed on the building, and considering the indefiniteness of the contracts and the character of the controversy, and the fact that the men did not quit in obedience to any order of their superiors, and that they have shown no desire to discontinue their breach of said contracts, we do not find, under the facts and circumstances of the case, that plaintiff is entitled to an order protecting its contractual relations from the disruptive influence of third parties.

A decree may be drawn dismissing plaintiff's petition, and in the exercise of our discretion we refuse to punish defendants for contempt of court in not obeying the order of the common pleas court, which we find should not have been made.

FARR, J., concurs.

SAYRE, J., concurring. In addition to what is said in the main opinion, I desire to add what strikes me with some force.

Plaintiff's cause was based on the theory that the defendants individually, and as representatives of certain labor organizations, ordered and directed the workmen to cease work on the telephone building, and the prayer of the petition is for an injunction to compel the defendants to undo what it is claimed they had done, by notifying the men that the strike order was rescinded, and to restore the status of things as they existed on the job prior to September 18, 1926.

It appears from the evidence that the labor organizations, acting as such, did not order or

cause the strike. Whether the strike was called by the business agents (excepting Claude Beach) was the principal question in the case, and it became necessary for the plaintiff to prove that issue.

"It has been variously stated in the decisions that, in order to authorize the issuance of an injunction, the right thereto must be established 'with certainty'; that the evidence must be 'clear,' 'clear and convincing,' 'clear and satisfactory'; that the right must be supported by the 'clearest proof'; that a 'clear and unexceptional right' to an injunction must be shown." 32 Corpus Juris, 350.

In Ohio the rule is announced in the case of *Spangler* v. *City of Cleveland*, 43 Ohio St., 526, 3 N. E., 365, as follows:

"1. The burden of establishing a right to a perpetual injunction, claimed by a party to an action, is upon such party.

"2. A court will grant a perpetual injunction only when a party shows a clear right thereto."

In the opinion the authorities cited for the above two propositions of the syllabus are the following:

"For a perpetual injunction the courts require that there should be no doubt in the case, and that the plaintiff must make out a clear and unexceptional right." Dan. Ch., 1681.

"The court will not exercise this necessary authority where the right is doubtful or the facts not definitely ascertained." *Burnham* v. *Kempton*, 44 N. H., 92.

"The right must be clear." *Bonaparte* v. *Camden & Amboy R. Co.*, Fed. Cas., No. 1617, 1 Baldw., 218.

The plaintiff, then, was compelled to make out its case by clear and convincing proof. The testi-

mony in this case is irreconcilable. If the witnesses for the plaintiff are to be believed, the business agents caused the walkout. If the witnesses for the defendants are to be believed, they did not.

So I cannot find by that degree of proof which the law requires that the business agents (leaving Claude Beach out of account) either directly or indirectly caused the men to cease work.

This court has no power to order the men to return to work. So, as it cannot do it directly, it cannot do so indirectly by any order directed to the business agents or other defendants.

Neither is there any foundation for enjoining the defendants from further calling strikes on the building, or from advising, counseling, or procuring others to strike, since the proof does not justify us in finding that the defendants have done, are about to, or will do any of these things in respect to the work on the building.

The final position of counsel for plaintiff, expressed in their reply brief, is stated as follows:

"Our contention is that the men desire to work, and are only prevented from so doing by the attitude of the unions, and their officers. All that we seek, in the way of relief, is the removal of this organized deterrent, which now constitutes a barrier between the men and the satisfaction of their desire to work."

The form of injunction which counsel suggest is (a) to restrain the defendants from organizing, resuming, or maintaining any strike because of the employment of nonunion glaziers by the Toledo Plate & Window Glass Company; (b) to restrain defendants from picketing or encouraging picketing in furtherance of such strike; and (c) to order de-

fendants or some of them to notify the workmen that the strike was not authorized, that said defendants are opposed to it and urge their members not to engage in it, and that the officers will discipline members of unions who hereafter quit work in combination on the building in furtherance of the strike.

The ground for the injunction desired and the form of it is based upon the proposition that the men desire to work and are prevented by the unions and their officers from so doing.

A complete answer to this is that in all the evidence introduced on various subjects there is substantially nothing to justify the idea that the men desire to work with nonunion glaziers. It appears in evidence that early in the week of September 13 the workmen on the job were complaining of the presence of the nonunion men, that they kept calling forth business agents to do something about it, that practically nothing was done either by the unions or the business agents until Saturday morning, September 18, when some of the business agents went to the building. Whether the business agents, with the exception of Claude Beach, then advised or counseled the strike, as would appear by witnesses for plaintiff, or merely acquiesced in the walkout, as appears by the witnesses for defendants, was, as before stated, the main subject of controversy in the trial. My conclusion is that the business agents, with the exception noted, merely acquiesced, in view, probably, of the notion that after the men learned that the plaintiff could or would do nothing to remove the nonunion glaziers it would be futile to undertake to stop the walkout.

The idea is advanced in the briefs that an order directing the defendants to notify the men that the strike was illegal, and that they may return to work if they desire, and that the officers will discipline members if they strike again on the same job for the same reason, will, if it does no good, at least do no harm. In other words, we are asked to try an experiment, and if it works, well and good, and if it does not, no one will be injured. I do not believe courts of equity, in exercising the writs of injunction, ever resort to experiment. They only issue injunctions in cases where parties have clear rights to them, and where it appears that the writs will be effective.

Judge FARR, of the Seventh Appellate District, Judge SAYRE, of the Fourth Appellate District, and Judge WASHBURN, of the Ninth Appellate District, sitting in place of LEVINE, SULLIVAN and VICKERY, JJ., of the Eighth Appellate District.